IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2008

## STATE OF TENNESSEE v. RAPHEAL LOVE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-08431      W. Fred Axley, Judge**

**No. W2007-01635-CCA-R3-CD  - Filed August 21, 2008**

The defendant, Rapheal Love, was convicted by a Shelby County Criminal Court jury of two counts of first degree premeditated murder and sentenced by the trial court to two consecutive terms of life imprisonment in the Department of Correction.  The sole issue he raises on appeal is whether the trial court erred in ordering consecutive sentencing.  Following our review, we affirm the consecutive sentences imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Wilson Jones, District Public Defender; Garland Ergüden, Assistant Public Defender (on appeal); and Timothy J. Albers and Trent Hall, Assistant Public Defenders (at trial), for the appellant, Rapheal Love.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Ray Lepone and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The State's proof at trial established that on the night of July 13, 2005, seventeen-year-old Jessica Sisson and her friend, David McVay, were shot to death by the sixteen-year-old defendant and two friends, Sidarrius Walker and Hosie Perry, that he had recruited to help him exact revenge against three men who had fired gunshots at him earlier in the evening.  According to the defendant's statement to police, he was visiting with friends outside his aunt's home in Memphis when "Joe," "Lil Squeaky," and "Frog," with whom he had been engaged in a long-running argument, drove by

the house firing gunshots. His aunt told him to "let the situation go," but he instead began telephoning various friends to tell them about the shooting.

After meeting up with two classmates, Joshua Parker and Timothy Payne, the defendant spoke by telephone with Perry, relating the story of the shooting and telling him he intended to get some guns. Perry arranged to meet him at his aunt's house, and Parker then drove the defendant and Payne to the home of another friend, Ladarius, where they picked up Walker. After picking up Perry, the men drove to another location where they were given two assault rifles and a shotgun by "Big 40," a man whom Walker had contacted by telephone. At that point, Ladarius called the defendant to tell him that he and his friends had just ridden through the neighborhood but had not seen anyone. Still later, Ladarius called back to tell the defendant that they had just driven back through the neighborhood and exchanged gunfire with the men.

The defendant and the friends with him in Parker's vehicle next drove through the neighborhood, where the defendant saw "Lil Squeaky [and] them standing out." Parker drove back to the neighborhood and parked his vehicle in a cove and the defendant, Walker, and Perry, each armed with a weapon, got out and began walking toward a crowd of people on the street. Lil Squeaky, Frog, and Joe started toward them and the defendant, Walker, and Perry began firing their weapons. Afterwards, they ran back to the car and Parker drove them from the scene, dropping Perry off first, then Walker, and finally the defendant. The defendant then called "Big 40," who came and retrieved the guns.

The defendant said that he learned the next morning that two people had been killed in the shooting. Asked if he had anything he wanted to add to his statement, he replied that he would like to apologize to the victims' families and to everyone who had been standing out in the street, that he had been "only thinking about getting back at those who shot at [him]," and that he would "take this as a learning experience."

Joshua Parker and Timothy Payne essentially corroborated the defendant's version of events. They testified at trial that after the defendant got into Parker's vehicle, he had Parker return to his aunt's house so that he could show the bullet holes to Parker and Payne. The defendant then directed Parker to another location to pick up Walker and then back to his aunt's house for Walker to view the damage. The defendant directed Parker to return to his aunt's house yet a third time after they had picked up Perry so that he could show the bullet holes to him as well. According to Parker, the defendant was upset, yet calm, each time he showed off the damage. Payne also testified that the defendant spoke in a normal tone of voice, neither yelling nor cursing, as he talked to Walker and Perry and showed them the bullet holes in the house.

Parker testified that the defendant was armed with one of the rifles, a weapon with a strap and a scope, during the shooting. He said when the defendant returned to the vehicle after the shooting, he was excited but calm. In his statement to police, the defendant also admitted that he was armed with one of the rifles during the shooting.

Memphis Police Officer Demar Wells testified that there were two crime scenes: an area on the street where the shooters fired their weapons and an area near the sidewalk approximately a

hundred yards away where the victims were hit. From the first crime scene, he recovered ten 7.6239 casings, which he said were projectiles shot from an assault or anti-personnel rifle such as an SKS, AK-47, or MAK-90; three spent twelve gauge shotgun shells; four shotgun plastic wads; two pairs of earplugs; and a small amount of powder cocaine.

Dr. Kenneth Snell, the forensic pathologist who performed the autopsies of the victims' bodies, testified that Jessica Sisson died as the result of a gunshot wound to the back while David McVay died as a result of a gunshot wound to the chest. He said that he recovered a copper-jacketed projectile consistent with a projectile from a high-velocity rifle from McVay's body. The gunshot wound to Sisson's body was also consistent with one caused by a high-velocity weapon.

The only witness the defendant presented in his behalf was his aunt, Clara Easley, who testified that after the gunshots were fired at her house, the defendant came inside and told her that he had not done anything to "them folks" and did not know why they were shooting at him. She said she told the defendant to let it go but could tell that he was angry.

The jury convicted the defendant of both counts of first degree murder as charged in the indictment, and the trial court sentenced him to life imprisonment for each count. In a sentencing memorandum and at the sentencing hearing, defense counsel requested that the trial court order concurrent sentences, submitting that the defendant did not qualify for any of the statutory criteria for consecutive sentencing. Among other things, counsel noted that the defendant's father and mother had both been murdered, in 1999 and 2002, respectively, which had led the defendant to become withdrawn and to change his behavior. The State, by contrast, argued that the defendant should be sentenced to consecutive life terms as a dangerous offender. Agreeing with the State, the trial court ordered that the defendant serve his sentences consecutively.

## ANALYSIS

The sole issue the defendant raises on appeal is whether the trial court erred in imposing consecutive sentencing. Citing, *inter alia*, his youth, tragic life experiences, expressions of remorse, and the fact that his only criminal offense prior to the murders consisted of a juvenile adjudication for unlawful possession of a firearm, he argues that the trial court erred in imposing consecutive sentencing based on a finding that he was a dangerous offender. The State cites, *inter alia*, the circumstances surrounding the killings, including the defendant's use of high-powered assault rifles and his actions in firing into a crowd of people in a residential neighborhood, to argue that the trial court acted within its discretion in ordering consecutive sentences on the basis that the defendant is a dangerous offender. We agree with the State.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence

reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

The defendant asserts that the trial court's "brief comments" at sentencing did not include any findings that the defendant was a dangerous offender and that an extended sentence was both necessary to protect the public and reasonably related to the severity of the offenses. Such findings, however, are implicit in the trial court's sentencing determinations, which occurred immediately after the State's argument on why the defendant qualified as a dangerous offender. The trial court made the following findings of fact when imposing consecutive sentencing:

> One of the things that the Court recalls is the way . . . that this defendant was pictured before the jury as being calm, rounding up is the best word I can say, those things that would make him successful in retaliation of what happened to his aunty's house.

> The calmness with which this individual did this is important. One of the witnesses, I recall, said that while pulling the weapon from the bag, he was calm. After the killing took place, he was calm. It wasn't some radical individual who decided what he was going to do. He methodically did in the order in which he needed to congregate what he needed to do.

> And then you look at this, as I recall, one of the weapons had a . . . sight on it, a telescope. Because this is not an accidental shot.

> None of these shots were accidental in that the victims were over or around a hundred yards away. And if you didn't practice with these weapons, you couldn't do that.

> You couldn't fire an AK-47 and just accidentally hit somebody a hundred yards away. You could, but the . . . averages are not really that sound. They had to have practiced.

> He knew who kept those weapons. He knew who to call who would call that individual and say, hey, we need those weapons. It was . . . a methodical thing.

> In addition, what did the victims do to this defendant to cause him to kill them? And the answer is nothing. Why were they out that night? Because her friend, her boyfriend, was walking her home. They were outside. They were killed.

> And yet, I've heard nothing . . . to tell me that this was just not anything more that a wanton killing, again, in Memphis, Shelby County, Tennessee. One died, then another died. Two life sentences is all that I can give him, and they will be consecutive.

The record supports the imposition of consecutive sentencing on the basis that the defendant is a dangerous offender. As the trial court observed, the evidence at trial established that the defendant calmly and methodically prepared the retaliatory attack that led to the victims' deaths. The defendant formulated the plan for revenge, recruited friends to help him, borrowed high-powered assault rifles and a shotgun, cruised through the neighborhood to hunt for his targets, calmly removed the weapons from the trunk of the car, and then fired multiple gunshots at a crowd of people who were gathered with his intended targets on a residential street. The defendant and his accomplices even brought earplugs to protect their hearing during the assault. These actions, in our view, clearly demonstrate that the defendant is a dangerous offender with little or no regard for human life and no hesitation about committing a crime in which the risk to life is high. Morever, the manner in which the defendant executed the attack supports a finding that his consecutive life sentences are both necessary to protect the public from his further criminal behavior and reasonably related to the severity of his offenses. We conclude, therefore, that the trial court did not err in imposing consecutive sentences.

## CONCLUSION

We conclude that the record supports the trial court's imposition of consecutive sentences on the basis that the defendant is a dangerous offender. Accordingly, we affirm the judgments of the trial court.

_____

ALAN E. GLENN, JUDGE